## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                              )
**ROBERT HALF INTERNATIONAL INC.,**           )
                                              )
    **Plaintiff,**                         )
                                              )
    **v.**                                )    **Case No. 18-cv-01001 (APM)**
                                              )
**NICHOLAS BILLINGHAM, et al.,**              )
                                              )
    **Defendants.**                        )
_____  )

## MEMORANDUM OPINION

### I.    INTRODUCTION

This matter is before the court on a motion for preliminary injunction by Plaintiff Robert Half International Inc., which seeks to enforce restrictive covenants contained within the employment contract of a former employee, Defendant Nicholas Billingham. *See generally* Pl.'s Mot for Prelim. Inj., ECF No. 6 [hereinafter Pl.'s Mot.]. Plaintiff, a professional staffing firm, seeks to enjoin Billingham from continuing to work in the District of Columbia office of his new employer, rival staffing firm Defendant Beacon Hill Staffing, until February 2019; soliciting Plaintiff's customers; and disclosing Plaintiff's confidential information—all of which the employment contract prohibited Billingham from doing after his employment with Plaintiff ended. Plaintiff also seeks to enjoin Beacon Hill from interfering with Billingham's compliance with the restrictive covenants.

Although it gives the court no pleasure to do so because it means a young person must be separated from his employment, for the reasons set forth below, the court grants Plaintiff's Motion for Preliminary Injunction.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    *Billingham's Employment with Robert Half*

This case arises out of Defendant Nicholas Billingham's resignation as an employee of Plaintiff Robert Half International ("Robert Half" or "Plaintiff") on February 12, 2018. *See* Verified Compl., ECF No. 1 [hereinafter Compl.], ¶¶ 2, 40–52. Robert Half is a personnel staffing firm that recruits and places workers in permanent and temporary jobs. *See id.* ¶¶ 2, 14–15, 40, 44. Billingham began working at Plaintiff's Boston office on May 27, 2014. *Id.* ¶ 16. It was his first job out of college. Pl.'s Mot. for Leave to File Under Seal, ECF No. 18 [hereinafter Pl.'s Mot. to File Suppl. Mem.], Ex. C., ECF No. 18-5 [hereinafter Billingham Dep.], at 21.

During his four years at the company, Billingham changed jobs and divisions several times. He was hired as a Staffing Manager for Plaintiff's "OfficeTeam" division, which places administrative support employees, and in November 2015 was promoted to a Division Director. Compl. ¶¶ 15–16. In December 2016, Billingham became a Senior Staffing Manager in the "Accountemps" division, which places accounting, finance, and bookkeeping employees. *Id.* The following year, in July 2017, Billingham transferred to Plaintiff's Washington, D.C., office, where he continued to work as an Accountemps Senior Staffing Manager. *Id.* ¶ 16. In this role, Billingham's job duties included "developing . . . business from new and existing [Robert Half] Customers," which he did, in part, by meeting with hiring managers and other key personnel to learn about a customer's needs and by recommending potential hires. *Id.* ¶ 19. He also met with individuals seeking employment to assess their skills and preferences, and attempted to match these candidates to job openings. *Id.* ¶ 20.

To fulfill his responsibilities at Robert Half, Billingham had access to information that Plaintiff considers and treats as "confidential, proprietary and/or trade secret information." Pl.'s Mot., Mem. in Supp., ECF No. 6-1 [hereinafter Pl.'s Mem.], at 6–7. Such information includes the names of existing and potential customers and candidates, as well as contact persons for those customers and candidates; the specific needs of customers and candidates; the terms of Plaintiff's agreements with customers and candidates; and the strengths and weaknesses of Plaintiff's business model. Compl. ¶ 21; *see also* Pl.'s Mem. at 6; Pl.'s Mem., Ex. 1, Aff. of Trey Barnette, ECF No. 6-2 [hereinafter Barnett Aff.], ¶¶ 24–25.

2.     *Billingham's Employment Agreement*

As a condition of his employment, Billingham was required to sign Plaintiff's standard Employment Agreement. *See* Compl. ¶ 26. *See generally id.*, Ex. A., ECF No. 1-1 [hereinafter Agreement]. The Agreement imposes numerous restrictions on Billingham following the end of his employment with Robert Half, several of which are relevant to this case. First, the Agreement bars Billingham for a period of one year from working for a competitor located within 50 miles of any office of Plaintiff at which Billingham worked in the year preceding his termination or resignation. Agreement § 9; *see also id.* § 7. Second, it restricts Billingham from disclosing Plaintiff's "confidential information," including "the name, address, contact persons or requirements of any existing or prospective customer, client, applicant, candidate or employee" during or after his tenure at the staffing firm. *Id.* § 8. The Agreement imposes the same limitations on information concerning Robert Half's procedures, organization, and strategies. *Id.* Third, the Agreement prohibits Billingham from soliciting any "Customer," which the Agreement defines as "any person, firm, entity, business or organization for whom any of the Applicable Offices performs or has performed services in the course of its business within the twelve months

preceding the [employee's] [t]ermination." *Id.* §§ 7, 10.  Finally, under the Agreement, Billingham is prohibited from soliciting Plaintiff's employees to leave the staffing firm, whether to work for Billingham personally or to work for another company.  *Id.* § 11.

The Agreement also contains a provision titled "Injunction."  *Id.* § 14.  That clause states that Billingham agrees that, "in the event of his actual or threatened breach" of the foregoing restrictions, "temporary and permanent injunctive relief would be appropriate remedies against such breach," because Plaintiff "would be irreparably harmed and the full extent of injury resulting therefrom would be impossible to calculate and [Plaintiff] therefore will not have an adequate remedy at law."[1]  *Id.* § 14.  That provision also recites that the employee "expressly acknowledges" that the aforementioned restrictions "are reasonable and necessary in order to protect and maintain the proprietary and other legitimate interests of [Robert Half] . . . and that the enforcement thereof would not prevent [Billingham] from earning a livelihood."  *Id.*  Billingham signed the Agreement, *see id.* at 7, and during the ensuing four years at Robert Half he never signed a different or new version of the Agreement.  The Agreement does not contain a termination date.  *See generally id.*

### 3.  Billingham's Resignation

On February 23, 2018, Billingham resigned from Robert Half.  Compl. ¶ 40.  He did not disclose his future professional plans.  *Id.*  Three days later, Plaintiff presented Billingham with a notice titled "Reminder of Post-Termination Obligations," which reminded Billingham that he had signed the Agreement and summarized its key terms.  *See* Compl., Ex. B., ECF No. 1-2.  Toward

---

[1] Oddly, the Agreement does not expressly list the prohibition on non-disclosure of confidential information as one of the restrictions that is reasonable and necessary to protect Plaintiff's business interests and the breach of which would result in irreparable harm.  *See id.* § 14.  That said, the "Injunction" clause does begin by stating that, "In view of Employee's access to confidential information and trade secrets and in consideration of the value of such property to Employer and other RHI Companies," Billingham agrees to injunctive remedies in the event of a breach.  *Id.*

the top of the notice appears the text "Non-Competition Covenant" followed by "Yes" and "No" check boxes. *Id.* The "Yes" box is checked. *Id.*

On March 7, 2018, Billingham started his employment as a Division Manager at Defendant Beacon Hill for the company's Financial division at its newly opened District of Columbia office. Compl. ¶ 42; Billingham Dep. at 67. Beacon Hill is another staffing firm and is a direct competitor of Robert Half. *See* Compl. ¶ 4. Soon after Billingham began work, Beacon Hill issued a press release announcing Billingham's employment and describing his work as "leading temporary and contract staffing" for Beacon Hill's District of Columbia office. *See* Compl. ¶ 45; *id.*, Ex. C, ECF No. 1-3 [hereinafter Press Release]. The announcement quoted Billingham as stating: "I look forward to adding to my team quickly, and taking market share from our competitors." Press Release.

It was through this press release that Plaintiff first learned of Billingham's new job. Hr'g Tr., ECF No. 29, at 13–14. The announcement prompted Robert Half to send Billingham a second notice, this time a letter dated March 21, 2018, that enclosed a copy of the Agreement and once more reminded him of its terms. Compl. ¶ 47, Ex. D, ECF No. 1-4 [hereinafter March 21 Letter]; *see also* Hr'g Tr. at 13–14. Plaintiff sent a copy of the letter to Beacon Hill's CEO, Andrew Wang, along with the Agreement. *See* March 21 Letter at 2. In the letter, Plaintiff sought from Billingham "written assurances" that he understood the Agreement and would abide by its restrictions. Compl. ¶ 47; *see* March 21 Letter. Billingham never responded. Compl. ¶ 48.

During his four months at Beacon Hill, Billingham has communicated with "customers"[2] who he first met while employed at Robert Half and, in some cases, customers with whom he

---

[2] Beacon Hill disputes that staffing companies have "customers" in the proprietary or exclusive sense, as it is common in the industry for companies seeking to hire or for individuals seeking a job to work with more than one staffing agency. Plaintiff does not dispute this characterization. It is within this context that the court uses the term "customer" in this opinion.

developed working relationships. *See, e.g.*, Pl.'s Mot. to File Suppl. Mem., Ex. L, ECF No. 18-14 [hereinafter March 12 LinkedIn Message]; *id.*, Ex. M, ECF No. 18-15 [hereinafter March 13 LinkedIn Message]; Billingham Dep. at 200. To be precise, Billingham has contacted at least 56 of Plaintiff's customers while in his new position. Billingham Dep. at 200 (acknowledging that he contacted 56 Robert Half "customers" while working at Beacon Hill). Billingham directly communicated with these contacts through LinkedIn messages, "email blasts," and telephone calls. *See* Pl.'s Mot. to File Suppl. Mem., Ex. G, ECF No. 18-9 [hereinafter Overlap List]; *id.*, Ex. I, ECF No. 18-11; Billingham Dep. at 236–53. Billingham admitted that these efforts were for the purpose of generating business for Beacon Hill. *See* Billingham Dep. at 195 (acknowledging that, while at Beacon Hill, he sent e-mail blasts to contacts with the hope of generating business and revenue); *id.* at 220 (acknowledging that his LinkedIn message and calls to a contact at an architecture firm were made with the purpose of reintroducing himself and ultimately getting business); Hr'g Tr. at 27–28; Defs.' Mot. to File Under Seal Opp'n to Pl.'s Appl. for Prelim. Inj., ECF No. 17, Ex. C., ECF No. 17-5, at 213–17, 263–70; Overlap List. Notably, many of the businesses that Billingham contacted were already customers of Beacon Hill.

Additionally, during his time with Beacon Hill, Billingham has shared and has attempted to put to use information that he learned about Robert Half's customers. For instance, Beacon Hill, like other staffing firms, uses a database to track communications and information about potential and current customers. Billingham has input into Beacon Hill's database specific information that he acquired while at Robert Half about certain customers, such as one company's dissatisfaction with Robert Half's services, other companies' past use of Robert Half, and key contact information. *See* Pl.'s Mot. to File Suppl. Mem., Ex. N., ECF No. 18-16 [Database Overlap Log], at 1–3.

Billingham's use of information that he acquired at Robert Half is also evident from some of his communications while at Beacon Hill. One week after starting his new position, Billingham sent a message through LinkedIn to a contact at an architectural firm at which he had placed a candidate while with Robert Half. *See* Billingham Dep. at 218–220; March 12 LinkedIn Message. In the message, Billingham inquired of the contact about how the candidate was doing, informed the contact about his new position with Beacon Hill, and asked to "catch up." *See* March 12 LinkedIn Message. Billingham acknowledged that the purpose of this communication was to generate business. *See* Billingham Dep. at 220–21. In a second LinkedIn message, Billingham contacted the hiring manager at a hotel with whom he had made a placement while working for Plaintiff. *See* Billingham Dep. 223–26; Pl.'s Mot. to File Suppl. Mem., Ex. M, ECF No. 18-15 [hereinafter March 13 LinkedIn Message]. As with the first message, Billingham inquired of the contact about how the candidate was doing, informed the contact about his new position, and asked to connect. *See* March 13 LinkedIn Message; Billingham Dep. at 223. As with the other LinkedIn message, Billingham admitted that he sent it to develop business. Billingham Dep. at 222–24.

Billingham continues to work at Beacon Hill. Billingham Dep. at 13.

### B.  Procedural Background

On April 27, 2018, Plaintiff filed a four-count complaint against Billingham and Beacon Hill. *See generally* Compl. As to Billingham, Plaintiff asserts claims of breach of contract and anticipatory breach of contract. *See id.* ¶¶ 62–83. As to Beacon Hill, Plaintiff alleges two claims: tortious interference with contract and unjust enrichment. *See id.* ¶¶ 84–105.

Approximately two weeks later, Plaintiff filed a Motion for Preliminary Injunction, ECF No. 6, and a Motion for Expedited Discovery, ECF No. 7. The court granted the request for

expedited discovery, *see* Order, ECF No. 9, and held a hearing on the preliminary injunction on June 13, 2018.[3] *See* Hr'g. Tr.  The motion for injunctive relief is now ripe for consideration.

## III.    LEGAL STANDARD

Preliminary injunctive relief, of the kind requested here, is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90, (2008) (citations omitted).  A court may only grant the "extraordinary remedy . . . upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Specifically, a plaintiff must show: (1) that it "is likely to succeed on the merits"; (2) that it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in [its] favor"; and (4) "that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted).

Courts in this Circuit traditionally have evaluated these four factors on a "sliding scale"— if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).  The Supreme Court's decision in *Winter*, however, called that approach into question and sparked disagreement over whether the "sliding scale" framework continues to apply, or whether a movant must make a positive showing on all four factors without discounting the importance of a factor simply because one or more other factors is convincingly established.  *Compare Davis v. Billington*, 76 F. Supp. 3d 59, 63 n.5 (D.D.C. 2014) ("[B]ecause it remains the law of this Circuit, the Court must employ the sliding-scale analysis here."), *with ABA,*

---

[3] While the parties were conducting discovery, Defendants responded to Plaintiff's Complaint with a Motion to Dismiss.  *See* Defs.' Mot. to Dismiss Verified Compl., ECF No. 15.  The court does not address that motion in this Memorandum Opinion.

*Inc. v. District of Columbia*, 40 F. Supp. 3d 153, 165 (D.D.C. 2014) ("The D.C. Circuit has interpreted *Winter* to require a positive showing on all four preliminary injunction factors." (citing *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring))).

Regardless of whether the sliding scale framework applies, it remains clear that a movant must demonstrate irreparable harm, which "always" has been "[t]he basis of injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959)). "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Indeed, if a court concludes that a movant has not demonstrated irreparable harm, it need not even consider the remaining factors. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) ("Because [the plaintiff] has made no showing of irreparable injury here . . . [w]e . . . need not reach the district court's consideration of the remaining factors relevant to the issuance of a preliminary injunction.").

## IV.    DISCUSSION

In its Motion for Preliminary Injunction, Plaintiff asks the court to enjoin Billingham from violating three sections of his Agreement with Plaintiff:  (1) Section 8, which bars the disclosure or misuse of Robert Half's confidential information; (2) Section 9, the non-compete clause that prohibits Billingham from working for a competitor located within 50 miles of Plaintiff's District of Columbia and Boston offices;[4] and (3) Section 10, which prohibits the solicitation of Plaintiff's

---

[4] The Boston office is covered by the non-compete because it qualifies as an "Applicable Office," as defined by the Agreement, because he worked there within a year of his resignation. *See* Agreement §§ 7, 9.

customers.[5]  *See generally* Pl.'s Mot.; *see also* Agreement §§ 8–10.  In addition, Plaintiff asks the court to enjoin Beacon Hill "from further interference" with the Agreement.  *See* Pl.'s Mot. at 4.

### A.  Injunctive Relief as to Billingham

#### 1.  *Likelihood of Success on the Merits*

The court begins with Plaintiff's likelihood of success on the merits.  Plaintiff's request for injunctive relief is a non-starter unless the Agreement's restrictive covenants are enforceable.  Defendants have called the Agreement's validity into question on two bases, arguing that: (1) the Agreement is void under Massachusetts law because the parties did not enter into a new contract after Billingham's employment materially changed, through internal promotions and the transfer to Washington, D.C.; and (2) the terms of the Agreement are overbroad.  *See* Defs.' Opp'n to Pl.'s App. For Prelim. Inj., ECF No. 19-1 [hereinafter Defs.' Opp'n], at 27–33.  The court begins by addressing what law governs this dispute, and then proceeds to analyze whether the Agreement is likely valid under the applicable law and, if so, whether Plaintiff likely can show Billingham is in breach.

#### a.  Whether Massachusetts or District of Columbia Law Governs the Agreement

The parties disagree as to the law that governs the Agreement.  Defendants contend that Massachusetts law applies until "at least" July 2017, when Billingham transferred to the District of Columbia office, because Massachusetts is the place where the parties entered into the Agreement.  *See* Def.'s Opp'n at 27–28 & n.20.  Under Massachusetts law, Defendants contend, "material" changes to an employment relationship—such as Billingham's promotions—"void[ ]"

---

[5] Plaintiff also alleges that Billingham has facilitated, either directly or indirectly, the solicitation of at least one of its employees to work for Beacon Hill, which would constitute a violation of Section 11 of the Agreement.  Compl. ¶ 67; *see also* Agreement § 11.  Plaintiff has not, however, substantiated this allegation with actual evidence at this juncture.  *See* Pl.'s Mot. to File Suppl. Mem., Mem. in Supp., ECF No. 18-2, at 7 n. 4.  Therefore, the court does not discuss this alleged violation as a ground for injunctive relief.

a restrictive covenant such as this one unless the contract is re-signed. *See id.* at 28–29 (citing *Iron Mountain Info. Mgmt., Inc. v. Taddeo*, 455 F. Supp. 2d 124, 132–34 (E.D.N.Y. 2006)). And, because Plaintiff and Billingham did not sign a new contract after material changes occurred, Defendants argue, the Agreement became void and thus unenforceable. *See id.* at 28–31. Plaintiff, on the other hand, maintains that District of Columbia law governs the Agreement, citing the Agreement's choice-of-law clause. Pl.'s Second Consent Mot. for Leave to File Under Seal, ECF No. 22, Reply in Supp. of Pl.'s Appl. for Prelim. Inj., ECF No. 22-2 [hereinafter Pl.'s Reply], at 3 & n.3. All parties agree that if District of Columbia law applies, then the failure to amend an employment agreement in the event of a material change does not operate to void the contract.

As a federal court sitting in diversity, this court must apply the choice-of-law rules of the District of Columbia. *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014). Under District of Columbia law, contractual choice-of-law "clauses govern as long as there is some reasonable relationship with the state specified." *Whiting v. AARP*, 637 F.3d 355, 361 (D.C. Cir. 2011) (internal quotations omitted). The choice-of-law clause in the Agreement is unusual. Rather than identifying a single state law to govern all disputes, the controlling law "floats" depending on when and where the contract is sought to be enforced. The clause states that, in the event of a breach, "the law[ ] of the state in which an activity occurred or threatens to occur and with respect to which legal and equitable relief is sought" will apply.[6] Agreement § 21. The court has not

---

[6] The choice-of-law provision states, in its entirety:

> 21. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the state in which an activity occurred or threatens to occur and with respect to which legal and equitable relief is sought, without reference to such state's choice of law rules. In no event shall the choice of law be predicated upon the fact that Employer is incorporated or has its headquarters in a certain state.

Agreement § 21.

found any case from this Circuit or the D.C. Court of Appeals that addresses the validity of a "floating" choice-of-law clause under District of Columbia law, and the parties have not cited any. But for present purposes the court need not evaluate the conscionability or public policy rationale for such a clause, as Defendants do not challenge it on such grounds. Accordingly, consistent with District of Columbia law, the court gives effect to the Agreement's choice-of-law clause because, as applied here, it bears a reasonable relationship to this jurisdiction (i.e., Billingham worked in Robert Half's District of Columbia office).

A plain reading of the text makes clear that District of Columbia is controlling. *Cf. Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 98 (D.D.C. 2004) (applying District of Columbia law to a similar Robert Half employment contract "because there is no choice of law provision in the Agreement designating some other law to follow"); *Hunter v. Bd. of Dirs. of Robert Half Int'l, Inc.*, 1:09-cv-448 (JCC), 2009 WL 10687961, at *4 (E.D. Va. Sept. 16, 2009) (enforcing "floating" choice-of-law provision in Robert Half employment contract). The District of Columbia is the place where Billingham's "activity occurred or threatens to occur and with respect to which legal or equitable relief is sought." Agreement § 21. Because District of Columbia law controls, the court rejects Defendants' argument that the Agreement is void because the parties did not amend it following material changes to Billingham's duties and position.

> b.      <u>Assuming Massachusetts Law Applies, Whether the Agreement Was Abrogated by Changes to Billingham's Employment with Plaintiff</u>

Even if Massachusetts law were to govern the Agreement, the court still would reject Defendants' argument that the Agreement is void and unenforceable. Defendants' argument rests primarily on a federal district court case not from Massachusetts, but New York, interpreting Massachusetts law: *Iron Mountain Information Management v. Taddeo*, 455 F. Supp. 2d 124

(E.D.N.Y. 2006). *Iron Mountain* considered whether an employer was likely to succeed on its breach-of-contract claim against a former employee who had taken a job at a competitor. *See* 455 F. Supp. 2d at 127–31. The employee had signed a non-compete agreement when he began working for the former employer, but had refused to sign a second non-compete agreement following a change in compensation. *See id.* At the preliminary injunction stage, the court read Massachusetts law to require that "a new restrictive covenant must be signed" any time "an employee's employment relationship with the employer changes materially." *Id.* at 132–33 (internal citation omitted). The court's understanding was premised on the Massachusetts Supreme Court's decision in *F.A. Bartlett Tree Expert Co. v. Barrington*, 233 N.E.2d 756 (Mass. 1968), a case in which the court refused to enforce a non-compete agreement after an employee similarly had refused to sign a new contract following changes to his compensation and sales area. *See Iron Mountain*, 455 F. Supp. 2d at 133. Applying *F.A. Bartlett*, the court in *Iron Mountain* concluded that the employer likely could not enforce the non-compete agreement because of the material change in the employment relationship and the failure to enter into a new agreement. *Id.* at 135–37.

The court does not find *Iron Mountain* to be persuasive and, instead, reads *F.A. Bartlett* as limited to its facts, much as Defendants do. The rigid view of Massachusetts law espoused in *Iron Mountain* is far from universally accepted. Several judges have rejected it. *See, e.g.*, *Anaqua, Inc. v. Bullard et al.*, No. SUCV201401491BLS1, 2014 WL 10542986, at *4 (Mass. Super. Ct. July 24, 2014) ("*Bartlett* did not . . . hold that '[e]ach time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed.'" (quoting *Iron Mountain*, 455 F. Supp. 2d at 132–33)), *aff'd*, 36 N.E.3d 79 (Mass. App. Ct. 2015); *Intertek Testing Servs. NA, Inc. v. Curtis-*

*Strauss LLC*, No. 98903F, 2000 WL 1473126, at *6 (Mass. Super. Ct. Aug. 8, 2000) (rejecting the defendants' argument that, under Massachusetts law, their non-compete agreements "became inoperative" because of changes in their employment relationship on grounds that in *F.A. Bartlett* the parties "had abandoned and rescinded by mutual consent" the non-compete agreement); *see also Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 16 (1st Cir. 2009) (explaining that under Massachusetts law, the enforceability of a non-compete agreement turns on whether the employment agreement has been "mutually abandoned and rescinded" and the intent of the parties (internal citation omitted)). *But see Interpros, Inc. v. Athy*, No. MICV201300214F, 2013 WL 2181650, at *3 (Mass. Super. Ct. May 5, 2013) (following principle that "each time an employee's employment relationship with the employer changes materially such that they have entered into a new relationship, a new non-competition agreement must be signed"). The better view is that Massachusetts law actually honors forward-looking restrictions in employment contracts and does not require the parties to enter into a new agreement each time there is a material change in the employment. *See, e.g.*, *A.R.S. Servs., Inc. v. Morse*, No. MICV201300910, 2013 WL 2152181, at *9 (Mass. Super. Ct. Apr. 5, 2013) (accepting without discussion that a provision stating that the terms of the non-compete agreement "shall continue to apply and be valid notwithstanding any change in . . . duties, responsibilities, position or title" was enforceable); *Leibowitz v. Aternity, Inc.*, No. 10 CV 2289, 2010 WL 2803979, at *22 (E.D.N.Y. July 14, 2010) (applying Massachusetts law and finding no abrogation where non-compete clause stated that "[a]ny subsequent change or changes in the [employee's] duties, salary or compensation will not affect the validity or scope of this Agreement"). Thus, the court respectfully disagrees with *Iron Mountain*'s reading of Massachusetts law.

Additionally, *Iron Mountain* and *F.A. Bartlett* are distinguishable on the facts. In *Iron Mountain*, the employee had refused to sign a *new* non-compete contract, thus giving rise to an inference that the parties had walked away from the original agreement. *See* 455 F. Supp. 2d at 134. Similarly, in *F.A. Bartlett*, the employment changes over a nearly 20-year period were so "substantial" that the court found that "[t]he conduct of the parties . . . is inconsistent with an intention that the [original employment] contract be continued in effect." 233 N.E.2d at 758. Here, in sharp contrast, there is no indication that the parties intended to abrogate the original agreement when Billingham's job responsibilities and positions changed. If anything, the parties agreed that there would be no need to enter into such new contracts if Billingham's position or compensation became different. Paragraph 3 of the Agreement states, in relevant part:

> This Agreement shall govern the employment of [Billingham] regardless of the division or duties to which [Billingham] is assigned. A change in assignment, whether within the same division or RHI Company or to a different division or RHI Company, shall have no effect on the terms or provisions of this Agreement . . . [.]

Agreement § 3. This provision belies any suggestion that the parties' intent was for the Agreement to become void upon material changes to Billingham's employment.[7]

In sum, the court concludes that, even if it applies, Massachusetts law did not operate to abrogate the Agreement.

      c.      <u>Whether the Non-Compete Agreement is Reasonable Under District of Columbia Law</u>

That leaves the question whether, under District of Columbia law, the Agreement's non-compete, non-disclosure, and non-solicitation provisions are reasonable and thus enforceable.

---

[7] This case also differs from *Iron Mountain* in one other important respect. In *Iron Mountain*, the court characterized the changed work condition as "a material, negative change" because a new compensation system would result in a reduction in pay. *See* 455 F. Supp. 2d at 132. That is not the case here, where Robert Half repeatedly promoted Billingham and increased his pay.

Defendants argue that the restrictions are overbroad because they are not limited to work involving customer contact or to contacts with customers that Billingham previously serviced. Defs.' Opp'n at 31–32. Defendants also claim that Plaintiff "has no legitimate interest" in information that it considers "confidential" or a "trade secret," including the names of potential customers and candidates. *Id.* at 32. For its part, Plaintiff defends the post-employment restrictions on grounds that they are analogous in duration and geographic scope to those previously upheld as reasonable under District of Columbia law, and that Beacon Hill's own employment agreement contains identical restrictions. *See* Pl.'s Reply at 3; Pl.'s Mot. to File Suppl. Mem., ECF No. 18-3 [hereinafter Beacon Hill Agreement].

Under District of Columbia law, a non-compete agreement's terms are enforceable if the restrictions further a legitimate business interest and are reasonable in duration and geographic scope. *See Deutsch v. Barsky*, 795 A.2d 669, 676–79 (D.C. 2002) (citing Restatement (Second) of Contracts: Restraint of Trade §§ 186–188 (1981)). Here, the Agreement's non-compete clause bars Billingham from working at a competitor who is located within 50 miles of an "Applicable Office," Agreement § 9, which translates to Plaintiff's District of Columbia and Boston offices. Similarly, the non-solicitation clause prevents Billingham from soliciting clients who have had contact with Plaintiff's Boston or District of Columbia offices for one year. *See id.* § 10. Courts applying District of Columbia law repeatedly have upheld restrictions that contain comparable restrictions with respect to time and duration. *See, e.g.*, *Deutsch*, 795 A.2d at 676–77 (two-year and five-mile restriction); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 74–76 (D.D.C. 2001) (one-year and 100-mile restriction); *Mercer Mgmt. v. Wilde*, 920 F. Supp. 2d 219, 237 (D.D.C. 1996) (one-year restriction); *Ellis v. James V. Hurson Assocs.*, 565 A.2d 615, 621 (D.C.

1989) (three-year restriction). Thus, the Agreement's restrictions are neither unreasonable nor unrelated to Robert Half's legitimate business interests.

The court's conclusion is underscored by Beacon Hill's own employment contract. That agreement imposes even stricter covenants than Robert Half's. It contains a 50-mile restriction *and* lasts for 18 months. *See* Beacon Hill Agreement § 4. Also, like Plaintiff, Beacon Hill prohibits its former employees from disclosing "Confidential Information," which includes "candidate lists, candidate resumes, customer lists, client names and contacts, job orders and related information, employee lists, personnel records, proposals, marketing strategies, policies and procedures . . . [and] business and operating methods." *Id.* § 3. Beacon Hill's contract shows that Plaintiff's Agreement is in line with industry standards.

Before moving on, the court turns briefly to Defendants' contention that the Agreement's restrictive covenants are overbroad because, for example, they would prevent Billingham from taking a job with Beacon Hill as a janitor or from contacting a company that became a customer of Plaintiff's Boston office only after Billingham's transfer. *See* Defs.' Opp'n at 31–32. The court need not indulge in this thought experiment because these hypotheticals do not resemble the instant case. The facts here raise concerns that are central to the Agreement's restrictive covenants. Billingham has taken a position at a direct competitor in the very city in which he worked for Robert Half and is performing the same type of work he did at Robert Half. The court therefore need not consider whether, in different circumstances, the Agreement's covenants would be too restrictive to be upheld.[8]

---

[8] In any event, District of Columbia law would allow the court to modify the Agreement to render it enforceable. *See generally Steiner v. Am. Friends of Lubavitch (Chabad)*, 177 A.3d 1246 (D.C. 2018).

d. <u>Whether Billingham Is in Breach of the Agreement</u>

The last step in this part of the court's inquiry is whether Plaintiff is likely to succeed in showing that Billingham is in breach.  It is.

First, Billingham's mere employment at Beacon Hill's District of Columbia office violates Section 9 of the Agreement, which prohibits him from working for a competitor that is located within 50 miles of Plaintiff's District of Columbia office for one year following his departure from Robert Half.  *See* Agreement § 9.  Defendants do not dispute that Beacon Hill's District of Columbia office is a "Competitor," as that term is defined in the contract.  *See id.* § 7 (defining a "Competitor"); *see also* Defs.' Opp'n at 8 (noting that, when hiring for the D.C. Beacon Hill Financial Office, "Beacon Hill did not . . . ask its recruiter to target any competitors").  Thus, from the moment Billingham began working at Beacon Hill, he was in breach of the Agreement.

Plaintiff also is likely to succeed in proving that Billingham has violated Section 10 of the Agreement, which bars Billingham from soliciting Robert Half's customers.  The evidence shows that Billingham has messaged and called dozens of Plaintiff's customers during his four months at Beacon Hill, using the connections that he developed at Robert Half, with the goal of generating business for Beacon Hill.  Defendants' attempt to downplay this evidence on grounds that customers do not have exclusive relationships with staffing firms, that these contacts were existing Beacon Hill customers, or that Billingham had not yet succeeding in converting contacts into Beacon Hill customers, misses the point.  The non-solicitation provision bars Billingham from "[s]olicit[ing] the trade or patronage of any Customer or perform services for any Customer," for a 12-month period after separating from Robert Half.  Agreement § 10.  The Agreement defines "Solicit" broadly to mean "soliciting, inducing, attempting to induce or assist any other person . . . in any such solicitation, inducement or attempted inducement."  *Id.* § 7.  And "Customer" is

defined "any person, firm, entity, business or organization for whom any of the Applicable Offices performs services in the course of its business within the twelve months preceding the Termination Date." *Id.* Reading these terms together, Billingham has violated the non-solicitation provision of the Agreement by communicating with Robert Half customers for the purpose of creating business opportunities for his new employer, even if the solicitations have not yet proved successful. To Billingham's credit, he candidly admitted that his communications with the contacts developed at Robert Half were for the purpose of soliciting business. His conduct plainly violates the Agreement.

Finally, Billingham has used Robert Half's confidential business information while employed by Beacon Hill in violation of Section 8 of the Agreement. The clearest examples of this breach are the entries that Billingham made into Beacon Hill's internal database that contain client information that he learned at Robert Half, such as the contact information of a key staffer of a client of Plaintiff, a report of a client's dissatisfaction with Robert Half's services ("used [Accountemps], not happy - spoken with her a bunch, use[s] temps"), a client's staffing history ("intro for BH [Beacon Hill]—placed 2 people with her while at [Robert] Half"), and a client's current staffing needs ("met with-might need a part time accounting [sic] next month [ ] worked with them at Half-catch up"). *See* Database Overlap Log at 1–4. Even if some of the information Billingham entered—such as contact information of Plaintiff's customers—is not confidential in the traditional sense of the word, it nevertheless falls under the proscribed information set forth in the Agreement. *See* Agreement § 8. And, even if the Agreement appears overbroad in what it considers confidential information, the collection of even publicly available contact information can constitute legally protected information. *See Morgan Stanley*, 150 F. Supp. 2d at 76 (holding that "customer lists of a financial-services firm deserve trade-secret status" under District of

Columbia law). Billingham signed a contract agreeing not to disclose and use such information, yet he did so almost immediately upon arriving at Beacon Hill.

Accordingly, the court finds that Plaintiff has demonstrated a substantial likelihood of success on its breach-of-contract claim against Billingham.

### 2. *Whether Plaintiff Is Likely to Suffer Irreparable Harm in the Absence of Injunctive Relief*

The parties vigorously dispute whether Billingham's continued work at Beacon Hill for the duration of this case will cause irreparable harm. In the preliminary injunction context, the moving party must show that such harm is likely to occur absent injunctive relief. *Winter*, 555 U.S. at 21; *accord Sampson*, 415 U.S. at 88 (explaining that a movant must demonstrate irreparable harm, which is "[t]he basis of injunctive relief in the federal courts"). This showing demands that the injury "is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Losses which may be adequately compensated by money damages or other corrective relief are inadequate. *See id.* at 297–98.

Plaintiff contends that, if Billingham is permitted to continue working at Beacon Hill, it will suffer irreparable harm in the form of damage to its relationships with customers, the disclosure of confidential and proprietary business information, and the loss of its competitive advantage. *See* Barnett Aff. ¶¶ 24–32. Defendants, on the other hand, challenge the immediacy of any harm—pointing out that Plaintiff has not identified a single customer lost to Beacon Hill or any tangible harm caused by Billingham's communications—and argue that, in any event, money damages would fully compensate Plaintiff for its injuries. *See* Defs.' Opp'n at 23–26. For the reasons that follow, the court concludes that Plaintiff has shown that it will suffer irreparable harm if Billingham is allowed to continue work at Beacon Hill's District of Columbia office.

Plaintiff first points to Billingham's acknowledgment in the Agreement that a breach will cause Plaintiff irreparable harm and that injunctive relief is warranted. *See* Pl.'s Mem. at 2–3, 27; *see also* Agreement § 14. Such a concession, standing alone, is not sufficient to carry the movant's burden. As the D.C. Circuit stated in *Smith, Bucklin & Associates, Inc. v. Sonntag*: "Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, this by itself is an insufficient prop." 83 F.3d 476, 481 (D.C. Cir. 1996) (citing *Ellis*, 565 A.2d at 619 n.14). Thus, evidence of irreparable harm must come from more than the contractual agreement itself.[9]

One factor in the harm calculus is *Beacon Hill's* tacit admission that, within the personnel staffing industry, the breach of a restrictive covenant is viewed as causing irreparable harm to the former employer. As Plaintiff notes, Beacon Hill requires its own employees to sign an agreement acknowledging that a breach or attempted breach by the employee "will cause irreparable damage to the Company." *See* Beacon Hill Agreement § 5. Additionally, employees must "agree[ ] that the Company shall be entitled as a matter of right to an injunction" against further violations. *Id.* That both companies require near identical concessions from their employees is compelling evidence that, within the staffing industry, monetary damages cannot adequately compensate an employer for violations of its restrictive covenants. Put another way, Plaintiff's anticipation that a violation of its non-compete agreement will cause irreparable harm is a view shared by other staffing firms.

---

[9] That a contractual acknowledgment cannot "by itself" establish irreparable harm does not, however, mean it is irrelevant. To the contrary, the D.C. Court of Appeals' decision in Ellis—the case cited by the Circuit in Smith, Bucklin, & Associates—states that, although a court is not bound by a "restrictive covenant [that] by its terms expressly contemplate[s] use of an injunction to remedy violation of the agreement, . . . . the clause may be influential in determining how the court will exercise its discretion." *Ellis*, 565 A.2d at 619 n.14 (internal quotation marks omitted).

Plaintiff also has shown irreparable harm by virtue of Billingham's use and disclosure of Plaintiff's confidential business information. Courts in this District have recognized that the disclosure of confidential information is, by its very nature, irreparable "because such information, once disclosed, loses its confidential nature." *Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) (citing *Council on Am.-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 76 (D.D.C. 2009); *Morgan Stanley*, 150 F. Supp. 2d at 77). Once Plaintiff's "information is disclosed to [ ] competitors in the market," Plaintiff to some extent will lose a competitive advantage over competitors, and "that loss would be hard to quantify through money damages." *Hospitality Staffing*, 736 F. Supp. 2d at 200. Billingham's use and disclosure of confidential information to his new employer, therefore, cannot be cured through money damages.

At the same time, Billingham's continued employment at Beacon Hill provides Beacon Hill a competitive advantage that it otherwise would not enjoy in the District of Columbia market. In Billingham, Beacon Hill hired someone who could hit the ground running in this geographic area, thereby allowing Beacon Hill "to essentially skip much of the expensive, time-intensive" investment that Robert Half made in Billingham. *See Reg Seneca, LLC v. Harden*, 938 F. Supp. 2d 852, 860 (S.D. Iowa 2013) (acknowledging that this "would be an irreparable harm"). The very character of the staffing industry drives home this point. This is a service industry in which relationships and information are the coin of the realm. *See, e.g.*, Billingham Dep. at 194 (explaining that by "reaching out to these contacts" through an e-mail blast, Billingham was trying "to build relationships to try to work with them if they ever had any needs"); *id*. at 36–37 (noting that creating matches between recruiters, candidates, and clients took "time and effort"). Because Billingham imported to Beacon Hill the relationships and customer knowledge that he developed at Robert Half, Beacon Hill is positioned to capitalize on Billingham's presence immediately,

without having to invest resources of its own to develop him into a productive asset. The resulting competitive disadvantage suffered by Robert Half cannot be quantified or ascertained.

Additionally, Plaintiff's need for injunctive relief is immediate. The restrictive covenant in Billingham's Agreement lasts for only another eight months, expiring in late February 2019.[10] This case, however, is not likely to conclude on the merits within that time. Thus, "injunctive relief is the only means of effective enforcement" of the restrictive covenant. *See Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006). Additionally, the record suggests that in the staffing industry, information "goes stale." *See* Billingham Dep. at 38. Thus, the value of Plaintiff's confidential information, which Billingham is sharing with Beacon Hill, is at its zenith now; its value will decrease with time. This too supports the need for timely injunctive relief.

Finally, the court is unmoved by Defendants' contention that Plaintiff cannot establish irreparable harm because it slumbered on its rights. Defendants point out that "43 days elapsed" from the time Beacon Hill issued its Press Release announcing Billingham's hire to the filing of the Complaint and, after initiating suit, it took Plaintiff another two weeks to seek an injunction. Defs.' Opp'n at 23. But Plaintiff's explanation for the passage of time is reasonable. Not long after Beacon Hill publicly announced Billingham's hiring, Plaintiff sent Billingham and his new employer a letter that summarized the Agreement's restrictive covenants, enclosed the Agreement itself, and warned of potential legal consequences for violating the Agreement. *See* March 21 Letter. Then, shortly after discovering information that suggested Billingham was trading on Plaintiff's confidential information, Plaintiff filed suit. That timetable does not undermine Plaintiff's claim of irreparable harm.

---

[10] Section 8, which prohibits the employee from disclosing or misusing confidential information, has no expiration date. Agreement § 8.

### 3. Whether the Balance of Equities Favors Injunctive Relief

The balancing of equities also weighs in favor of granting injunctive relief. As explained above, Plaintiff has shown that it will suffer irreparable harm should Billingham continue to work for Beacon Hill. The need for timely injunctive relief to minimize or prevent such harm is apparent.

An injunction preventing Billingham from working in the industry and markets he knows best will no doubt harm him and his employer. That harm, however, is mitigated by two factors. First, the restraint is temporary. At most, it will run eight months, until the one-year anniversary of his resignation from Plaintiff, and it will not prevent him from working in the staffing services industry more than 50 miles from Plaintiff's District of Columbia and Boston offices (although the court recognizes the challenges associated with doing so). Moreover, Billingham and Beacon Hill brought this harm upon themselves. Billingham, of course, knew about the Agreement's restrictive covenants and Beacon Hill, at a minimum, learned about them soon after hiring Billingham, but before he began work. *See* Pl.'s Mot. to File Suppl. Mem., Ex. D, ECF No. 18-6 [hereinafter Mulhern Dep.], at 188 (Beacon Hill's corporate representative acknowledging that on February 28, 2018, Billingham e-mailed him Robert Half's reminder of the Agreement). Yet, the evidence shows that Defendants disregarded Billingham's commitments under the Agreement. Billingham testified that, *before* he started work, on February 28, 2018, he forwarded a copy of the "Reminder of Post-Termination Obligation," Compl., Ex. B, ECF No. 1-2, to Bryan Mulhern, Beacon Hill's regional director and Billingham's future supervisor. Mulhern advised him "not to give it any thought." Billingham Dep. at 268. Mulhern's testimony corroborates this account: He admitted receiving the Reminder of Post-Termination Obligation from Billingham, and he advised Billingham via e-mail: "I wouldn't give it much thought. If they want to they may send a threat

when they learn where you have gone. If they do that, then we will decide if and how we want to respond." Mulhern Dep. at 191–92. Mulhern further testified that, after Billingham and Beacon Hill received the "threat letter," he forwarded it to legal counsel, but did nothing else to ensure that Billingham did not run afoul of the restrictive covenants. *Id.* at 196–98. Beacon Hill's cavalier approach is the reason Defendants find themselves where they are today. Accordingly, the court finds that the balance of the equities supports the issuance of a preliminary injunction.

### 4. *Whether an Injunction Is in the Public Interest*

That leaves the question whether Plaintiff's requested injunction is in the public interest. The court concludes that it is. The public has an interest in enforcing contractual agreements and ensuring the confidentiality of a private business's information and trade secrets, "which is necessary for free and fair competition." *See Hospitality Staffing*, 736 F. Supp. 2d at 201; *see also Morgan Stanley*, 150 F. Supp. 2d at 79 (granting injunctive relief and finding that "the court serves the public interest in protecting trade-secret client lists and other confidential information"). Defendants' argument to the contrary—that "[t]he public has a strong interest in allowing a person to employ his talents in a useful manner in the field of his choosing," *see* Defs.' Opp'n at 42—ignores the fact that Billingham voluntarily agreed to the work for a company that subjected him to restrictive covenants and that Beacon Hill, too, uses non-compete agreements to protect its interests. Accordingly, this final factor weighs in favor of issuing preliminary injunctive relief.

### B. Injunctive Relief as to Beacon Hill

Because the injunction against Billingham will accomplish the same result as Plaintiff's requested injunction against Beacon Hill, the court only briefly addresses Plaintiff's request for injunctive relief as to Beacon Hill. *See* Pl.'s Mem. at 25–27. And, because the harm and equitable

considerations are the same as discussed above, the court need focus only on whether Plaintiff's claim against Beacon Hill, tortious interference with contract, is likely to succeed.[11]

Plaintiff alleges that Beacon Hill tortiously interfered with its contractual relationship with Billingham, specifically the Agreement's restrictive covenants. Compl. ¶¶ 1, 84–96. To prove such a claim, Plaintiff must show: (1) the existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional interference with that relationship; and (4) resulting damages. *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1038–39 (D.C. 2015). These elements, if established, make out a prima facie case of tortious interference, whereupon the burden shifts to the defendant to show that its conduct was justified or privileged. *Onyeoziri v. Spivok*, 44 A.3d 279, 286–87 (D.C. 2012).

The court already has determined that elements one, two, and four are supported by record evidence. As to the third element, the record shows intentional interference by Beacon Hill. As discussed above, Billingham made Beacon Hill aware of both the Agreement and Robert Half's admonitions to comply with its restrictive covenants. Yet, Beacon Hill continued to employ Billingham. Furthermore, according to Mulhern's testimony, despite having received the Agreement, Beacon Hill did not undertake any steps to prevent Billingham from sharing information he had learned through his former employment or from contacting Plaintiff's customers, especially customers with whom Billingham worked and developed relationships. *See* Mulhern Dep. at 197–98. Plaintiff thus has made out a prima facie case of tortious interference with contract. Beacon Hill, in response, offers no justification or privilege for its role in Billingham's violations of the Agreement's restrictive covenants.

---

[11] The court does not address Plaintiff's other claim against Beacon Hill, unjust enrichment.

In sum, the court finds that Robert Half is likely to succeed on its tortious interference claim against Beacon Hill.  Accordingly, Plaintiff also is entitled to injunctive relief as to Beacon Hill.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction, ECF No. 6, is granted.  Plaintiff will be required to post a cash bond with the Clerk of the Court in the amount of Billingham's base salary from the date of this Memorandum Opinion until February 23, 2019.  A separate Order accompanies this Memorandum Opinion.

Dated:  June 29, 2018                                    Amit P. Mehta
                                                        United States District Judge